IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFFREY SCHEETS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 09-3437-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Jeffrey Scheets seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding plaintiff's osteoarthritis and depression were not severe impairments, (2) ignoring three years' worth of medical records and the opinion of plaintiff's chiropractor when determining plaintiff's residual functional capacity and in failing to account for plaintiff's respiratory disorder, (3) in failing to consider the opinion of plaintiff's chiropractor because he was not an acceptable medical source, and (4) improperly discounted plaintiff's testimony. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On August 2, 2006, plaintiff applied for disability benefits alleging that he had been disabled since August 2, 2006.[1]  In his application, plaintiff alleged that his disability stems from spinal scoliosis, lumbar degenerative disc disease, and respiratory problems.  Plaintiff's application was denied on January 10, 2007.  On February 18, 2009, a hearing was held before an Administrative Law Judge.  On March 18, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 25, 2009, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>,

---

[1]Plaintiff previously applied for benefits on June 17, 2001, and his application was denied by an ALJ on March 7, 2003, and by the Appeals Council on June 30, 2003 (Tr. at 40).  He filed his second application on June 30, 2004, and that application was denied at the initial level (Tr. at 40).  Plaintiff did not appeal.  This is plaintiff's third application for benefits.  He originally alleged an onset date of April 29, 2001 (Tr. at 4). however, because of the previous decisions, his alleged onset date was amended to August 2, 2006 (Tr. at 4).

402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

***III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jeanine Metildi, in addition to documentary evidence admitted at the hearing.

## A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1983 through 2008:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1983 | $   825.77 | 1996 | $ 9,630.12 |
| 1984 | 601.00 | 1997 | 9,833.74 |
| 1985 | 6,050.26 | 1998 | 11,262.71 |
| 1986 | 3,548.04 | 1999 | 11,309.32 |
| 1987 | 6,769.26 | 2000 | 11,430.38 |
| 1988 | 0.00 | 2001 | 3,356.30 |
| 1989 | 54.16 | 2002 | 0.00 |
| 1990 | 90.00 | 2003 | 0.00 |
| 1991 | 1,021.02 | 2004 | 0.00 |
| 1992 | 50.00 | 2005 | 0.00 |
| 1993 | 2,130.79 | 2006 | 185.27 |
| 1994 | 0.00 | 2007 | 0.00 |
| 1995 | 2,091.99 | 2008 | 0.00 |

(Tr. at 87).

**Function Report**

In a Function Report dated September 13, 2006, plaintiff reported that he tries to go to a gym two to three times per week, he uses a computer and the internet at the library, and he does "a lot of reading and television" although he has trouble concentrating (Tr. at 108-115). "[I] haven't found any work-at-home things that aren't scams."

**Written Questions to Claimant**

In a document entitled "Written Questions to Claimant" dated January 2, 2009, plaintiff wrote that his depression was "not

extreme" (emphasis in the original) (Tr. at 171).  When asked how

his mental condition limits his ability to work, plaintiff left

that blank (Tr. at 171).  He also left blank the sections that

asked how his mental condition limits his ability to interact

with supervisors and co-workers; understand, remember, and carry

out technical or complex job instructions; understand, remember,

and carry out simple one- or two-step job instructions; deal with

the public; and maintain concentration and attention for at least

two-hour increments (Tr. at 171).

**B.    *SUMMARY OF MEDICAL RECORDS***

On January 8, 2001, plaintiff began receiving chiropractic

treatment from C. Gerald St. John, D.C., with the St. John

Chiropractic Office (Tr. at 331-351). In January 2003, plaintiff

reported that his health was "fair", that it was "about the same"

as it was a year earlier, that vigorous activities such as

running, lifting heavy objections and participating in strenuous

sports limited him "a lot", that moderate activities such as

moving a table or pushing a vacuum cleaner limited him "a lot",

that lifting or carrying groceries limited him "a lot." (Tr. at

353).  He also reported being limited "a lot" in climbing several

flights of stairs, walking more than a mile, and walking several

blocks.  He reported being limited "a little" in climbing one

flight of stairs, bending, kneeling, stooping, and walking one

block. He was not limited at all in bathing or dressing himself. Plaintiff was asked whether in the past year he had felt sad, blue, or depressed for two weeks or more, and he answered, "no" (Tr. at 355). He was asked if he had felt depressed or sad much of the time in the past year, and he answered, "no."

Dr. St. John determined plaintiff suffered from chronic subluxation[2] in the lumbar, thoracic and cervical regions. (Tr. at 350). At this time, Dr. St. John recommended that plaintiff avoid prolonged sitting, standing, walking and jarring motions and avoid lifting over five pounds. (Tr. at 351).

Meanwhile, in July 2001, plaintiff was examined by Thomas F. Satterly, Jr., D.O., who determined plaintiff suffered from lumbar disc disease with degenerative changes at L5-S1 which caused him to have chronic back pain (Tr. at 184). Dr. Satterly also determined plaintiff had short-leg syndrome to the right with a 7/8 inch change of shortness to the right leg that aggravated plaintiff's chronic back pain (Tr. at 184). Dr. Satterly recommended plaintiff avoid repeated bending, lifting, stooping, climbing and crawling (Tr. at 184).

---

[2]When one or more of the vertebrae move out of position and create pressure on or irritate spinal nerves. Spinal nerves are the nerves that come out from between each of the vertebrae. This pressure or irritation on the nerves then causes those nerves to malfunction and interfere with the signals traveling over those nerves.

In September 2002, plaintiff was examined for persistent low back pain at Vocational Rehabilitation by Matthew Rieth, M.D. (Tr. at 182). Plaintiff reported right low back pain that became worse in the last two years and that he required the use of a single point cane (Tr. at 182). Plaintiff explained that the pain was constant and became worse with movement or prolonged positioning (Tr. at 182). On examination, Dr. Rieth noted spasm and tenderness of the left lower paraspinals and tenderness in the right lumbosacral junction region (Tr. at 183). Dr. Rieth assessed plaintiff with scoliosis[3] of the thoracolumbar spine with secondary muscle spasm in the lumbar paraspinals and right gluteal region and pain syndrome (Tr. at 183).

Plaintiff began seeing William C. Wright, M.D., with the TCMH Clinic in February 2003, seeking treatment for right hip pain, scoliosis, chronic back pain, and leg length discrepancy (Tr. at 316). Plaintiff reported being in constant pain that became worse if he sat for too long (Tr. at 316). Plaintiff was observed using a cane and walking with a limp as one leg was shorter than the other (Tr. at 316). Plaintiff was assessed with leg length discrepancy and chronic low back pain. He was given Diclofenac.[4] "He probably would benefit from use of a cane and

---

[3]Abnormal curve of the spine.

[4]Non-steroidal anti-inflammatory.

this will be ordered as well." (Tr. at 316).

Plaintiff continued seeing his chiropractor, Dr. St. John, approximately every two weeks from 2003 through 2006 for chiropractic adjustments for plaintiff's low back and neck (Tr. at 362 to 453). During 2006, plaintiff continued to be evaluated and treated with chiropractic adjustments on a monthly basis by his chiropractor. Plaintiff indicated his level of pain increased during this year from moderate to severe in both sides of his lower back, middle back, upper back and neck along with continued moderate pain in his right shoulder (Tr. at 574-577, 448-453). Plaintiff reported his overall pain ranged from six to eight on a ten-point pain scale. Dr. St. John noted plaintiff's right leg was shorter than his left leg resulting in postural compromise. Dr. St. John noted misalignment and the presence of spasm in the left and right lower lumbar region along with spasm and tenderness in the right upper thoracic region that radiated to his legs (Tr. at 574-577, 448-453).

Meanwhile, in October 2003, plaintiff reported to Dr. Wright continued problems with low back pain that radiated down plaintiff's legs. On exam, plaintiff's back was observed as being mildly tender over the lumbar spine, and leg length discrepancy was noted (Tr. at 315). Plaintiff reported that physical therapy had provided some improvement and he had

continued his exercises at home.  Plaintiff was prescribed

Ultram[5] to help with the pain (Tr. at 315).  An MRI of

plaintiff's lumbar spine on October 25, 2003, at the Texas County

Memorial Hospital showed mild degenerative disc disease at L1-2

and mild to moderate degenerative disc disease at L5-S1 with

small disc herniation at L5-S1 without evidence of significant

central canal or foraminal stenosis (narrowing) (Tr. at 237).

Plaintiff continued to follow up with Dr. Wright throughout

2004 concerning his chronic back pain, insomnia, and right hip

problems (Tr. at 305-314).

In June 2004 plaintiff, who was still experiencing right hip

pain, was referred to Mid-Missouri Orthopedic and Sports Medicine

(Tr. at 179).  An examination of plaintiff by Curtis D. Mather,

D.O., revealed that plaintiff had tenderness over the sacroiliac

joint with a positive Faber test.[6]  Dr. Mather assessed plaintiff

---

[5]An analgesic used to treat moderate to severe pain.

[6]The Patrick or FABER test is a screening test for pathology
of the hip joint or sacrum.  The test is performed as follows:
Place the patient in the supine position, flex the leg and put
the foot of the tested leg on the opposite knee (the motion is
that of Flexion, Abduction, External Rotation at the hip). Slowly
press down on the superior aspect of the tested knee joint
lowering the leg into further abduction.  The test is positive if
there is pain at the hip or sacral joint, or if the leg can not
lower to the point of being parallel to the opposite leg.  A
positive result suggests sacroiliitis, an inflammation of one or
both of the sacroiliac joints, which connect the lower spine and
pelvis. Sacroiliitis can cause pain in the buttocks or lower
back, and may even extend down one or both legs. The pain
associated with sacroiliitis is often aggravated by prolonged

with sacroiliitis and ordered an epidural steroid injection of
the sacroiliac joint under fluoroscopy (Tr. at 181).

Plaintiff was reevaluated by Dr. Mather in July 2004
concerning his epidural steroid injection (Tr. at 178).
Plaintiff reported he experienced some relief afterwards but was
still experiencing pain in his back (Tr. at 178).  Plaintiff was
noted to have a little tenderness over the sacroiliac joint on
examination along with good range of motion and an improved gait
(Tr. at 178).

On November 23, 2004, plaintiff was seen by Tammy Whipple-
Manes, R.N., at the Springfield Neurological and Spine Institute
(Tr. at 266-268).  He complained of low back pain, right hip
pain, thoracic pain, and a history of scoliosis.  Plaintiff rated
his current back pain an eight out of ten.  Walking, lying in one
position for too long, the weather, and stairs aggravated his
symptoms.  Plaintiff had participated in physical therapy more
than a year earlier but said he continued to perform the
exercises at home.  He also reported using weights and bicycling
three times a week.

On exam, Ms. Whipple-Manes found that plaintiff had
significant scoliosis and kyphosis in the lower thoracic/upper
lumbar region of his back.  He had no limitation in range of

standing or by stair climbing.

motion in the cervical or lumbar spine; and there was no tenderness to palpation in the cervical or lumbar spine. Ms. Whipple-Manes talked to Dr. Ceola on the phone, and the doctor told plaintiff to have x-rays and an MRI of his thoracic and lumbar spine before he returned.

Beginning in January 2005, plaintiff was examined by Dr. Fazili who determined that plaintiff had mild tenderness in the lumbosacral and paraspinal regions (Tr. at 254). Dr. Fazili determined plaintiff suffered from chronic low back pain with a herniated disc in the lower back and from short leg syndrome. He instructed plaintiff to continue taking Norco[7] and Trazadone (an antidepressant) (Tr. at 254-255).

On January 11, 2005, plaintiff saw Dr. Wade Ceola regarding his scoliosis and low back pain (Tr. at 269). Dr. Ceola determined plaintiff had a 35-degree curve centered around T8 with a dextroscoliosis (curvature to the right) with continued pain in the low back (Tr. at 269). Dr. Ceola further determined that plaintiff was not a surgical candidate for his scoliosis and that plaintiff's low back pain was probably not triggering his hip pain (Tr. at 269).

Plaintiff continued to follow up with Dr. Fazili in February and March 2005 regarding plaintiff's chronic low back pain and

---

[7]Acetaminophen and Hydrocodone, a narcotic analgesic.

short leg syndrome (Tr. at 255-256). Plaintiff was evaluated by Dr. Fazili in June 2005 due to his complaints of intermittent shortness of breath. Plaintiff had a normal lung exam (Tr. at 257).

On March 8, 2005, plaintiff followed up at the Springfield Neurological and Spine Institute with Dr. Ceola regarding his scoliosis and reported his pain was doing "quite a bit better" (Tr. at 270). Dr. Ceola scheduled an epidural injection for June and again advised plaintiff that surgical intervention was not necessary at this stage of his scoliosis (Tr. at 270).

Also in June 2005, plaintiff saw Dr. Thomas Brooks in the Pain Clinic for low back pain that radiated into his right hip and right leg along with numbness and tingling in his toes (Tr. at 226). Plaintiff reported the pain as constant and said it was exacerbated by sitting (Tr. at 226). An examination revealed that plaintiff had scoliosis (curving of the spine) in the thoracic spine (Tr. at 227). An MRI of the lumbar spine showed plaintiff had a broad-based disk bulge at L4-5 and L5-S1, and Dr. Brooks determined that plaintiff suffered from lumbosacral radiculitis.[8] (Tr. at 227). Plaintiff received a lumbar epidural steroid

_____

[8]Lumbar radiculitis is an umbrella term for a painful condition occurring along the root of any of the nerves extending from the lower (also known as lumbar) region of the spine. The pain may result from the lumbar nerve being either pinched, inflamed, irritated, or not working properly because of a lack of proper blood supply.

injection for his low back pain (Tr. at 227).

In July 2005, plaintiff was seen again by Dr. Fazili who reported that plaintiff's chest x-ray showed evidence of acute chronic obstructive pulmonary disease ("COPD") and determined that plaintiff had probable restrictive lung disease along with his herniated disc in the lower back, chronic low back pain, and short leg syndrome (Tr. at 258).

In August 2005, Patricia L. Bell, M.D., examined plaintiff for what plaintiff believed was a deviated septum (Tr. at 264). Plaintiff reported that he had suffered from breathing problems for the past 20 years and had been using NeoSynephrine nasal spray twice a day for the past 12 months (Tr. at 264). Dr. Bell diagnosed plaintiff with rhinitis medicamentosa[9] and prescribed Flonase nasal spray (Tr. at 264).

On September 27, 2005, plaintiff was evaluated again by Dr. Ceola regarding his scoliosis (Tr. at 252). Plaintiff reported that his pain was worsening, and Dr. Ceola recommended plaintiff try a brace for his back and then, if the pain did not improve, surgical intervention might be considered (Tr. at 252).

In a letter "to whom it may concern" dated September 27, 2005, Dr. Ceola concluded that plaintiff suffered from severe

---

[9]Also known as rebound rhinitis or chemical rhinitis. Rhinitis means stuffy nose. Rebound rhinitis is characterized by nasal congestion without runny nose and occurs due to over-use of decongestants.

scoliosis in his back and would need bracing in order to stabilize the spine (Tr. at 322).  The purpose of the letter was to indicate that it was "medically necessary for the patient to receive a custom made orthotic thoracolumbar brace".

On March 20, 2006, plaintiff saw Tammy G. Albrecht, M.D., with the St. John's Clinic to establish care (Tr. at 249). Plaintiff reported having chronic back pain with degenerative disk disease and needed to walk with a cane full time (Tr. at 249).  "Currently, he is working with telemarketing, but is only able to work about six hours a day before the pain is too much for him.  He takes Norco[10] three times a day.  It was last filled on 03/13. He got #60 at that time.  He increased it himself to three times a day for pain control."  Plaintiff reported that his pain was overwhelming and that he suffered from insomnia (Tr. at 249).  Plaintiff had not been taking his Lipitor (for high cholesterol).  He said he "needed to obtain help with disability or his work assistance" about which Dr. Albrecht wrote, "I am kind of unclear with that."  He was described as "overweight". Plaintiff was assessed with degenerative disk disease of the lumbar spine, allergies, insomnia, and hyperlipidemia.  Dr. Albrecht told plaintiff to start taking his Lipitor and come back in six weeks for lab work.

---

[10]Acetaminophen and hydrocodone, a narcotic analgesic.

16

On April 6, 2006, plaintiff was followed up by Dr. Ceola concerning his scoliosis (Tr. at 320). Dr. Ceola determined that plaintiff's scoliosis was most prominent at the thoracic spine and would consider bracing if plaintiff's pain worsened; "otherwise [return in] 1 year with films." (Tr. at 320). Since De. Ceola had recommended a brace in September 2005, it can be assumed that plaintiff did not obtain the brace in September 2005. A spine scoliosis survey showed some improvement in scoliosis centered at the T8 level that now measured approximately 30 degrees (Tr. at 321).

On April 11, 2006, plaintiff was evaluated for a thoracolumbar brace to reduce his pain from his scoliosis (Tr. at 247). "No bracing or surgery has been done to date." Plaintiff was noted to have "good hand strength." Plaintiff returned on April 20, 2006, to try on a TLSO (thoracolumbosacral orthosis) and a soft thoracolumbar support to see which one he liked better (Tr. at 246). Plaintiff indicated he liked the soft thoracolumbar support better. He was told that once Medicaid approved the order, he could come back for a final fit.

On May 12, 2006, plaintiff was fitted for a thoracolumbar back brace due to his scoliosis and back pain (Tr. at 245).

Plaintiff was referred for services at Mt. Grove Clinic on August 1, 2006, as plaintiff had recently lost his temper with

his caseworker (Tr. at 454-457).  Plaintiff reported having

problems with depression on and off for the past three years and

indicated that his current depressive episode had lasted

approximately two months (Tr. at 454).

Plaintiff reported no difficulties with activities of daily

living.  When asked about his social life, he said, "I don't go

out socially, you need an income for that."  He reported that he

enjoyed "computer game making."  Plaintiff said his future

educational goals included "any type of computer training that he

can get."  Plaintiff said that for the past two months he had

been having difficulty concentrating, remembering, making

decisions (Tr. at 456).  Plaintiff was diagnosed with major

depressive disorder, recurrent, moderate and post traumatic

stress disorder ("PTSD").  He was assessed a GAF score of 51-

53.[11]

August 2, 2006, is plaintiff's alleged onset date.

On August 24, 2006, plaintiff saw Dr. Albrecht for a

comprehensive evaluation (Tr. at 285).  Plaintiff was having no

acute complaints but on questioning reported experiencing

depression.  "He is having trouble with concentration, difficulty

---

[11]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

with his room-mate." Plaintiff was assessed with hypertension (his blood pressure was 140/90), chronic back pain, dyslipidemia (an abnormal amount of cholesterol or fat in the blood - plaintiff's cholesterol was 200, LDL was 118), and depression. Dr. Albrecht increased plaintiff's Lipitor to get his LDL down, and she gave him a prescription for Celexa for depression (Tr. at 285).

From August 2006 through November 2006, plaintiff attended individual psychotherapy sessions for his major depression and his continued problems with past abuse and anxiety (Tr. at 458-466). The August 29, 2006, record notes that plaintiff "was very focused on computers and expressed frustration that others didn't want to work as hard on his work as he did." (Tr. at 464).

December 31, 2006, was plaintiff's last insured date.

A Physical Residual Functional Capacity Assessment was completed on January 8, 2007, by a state agency physician (Tr. at 468-473). Plaintiff was determined to be capable of occasionally lifting and/or carrying 20 pounds and 10 pounds frequently; standing and/or walking at least two hours in an eight-hour workday; sitting for about six hours in an eight-hour workday with unlimited pushing and/or pulling; occasionally climbing ramp/stairs, stooping, kneeling, crouching and crawling; and should avoid concentrated exposure to extreme cold, vibration and

hazards (Tr. at 468-473).

A Psychiatric Review Technique form was completed on January 8, 2007, by Elissa Lewis, Ph.D., who determined that plaintiff's mental impairment of depression was non-severe (Tr. at 474-484). Plaintiff was found to have no limitations in his ability to perform activities of daily living; maintain social functioning; and maintain concentration, persistence and pace (Tr. at 482).

In 2007, plaintiff's chiropractor, Dr. St. John, continued to evaluate and treat plaintiff with chiropractic adjustments on a monthly basis. Plaintiff indicated he suffered from severe pain in both sides of his lower back, middle back, upper back and neck along with moderate pain in his right shoulder.  Dr. St. John determined plaintiff's right leg was 3/4 of an inch shorter than the left leg and resulted in functional pelvic deficiency and postural compromise.  Dr. St. John noted the presence of malalignment with associated tense muscles at the left lower cervical region and right upper cervical region.  Dr. St. John further noted joint dysfunction was present in the entire thoracic spine and signs of malalignment were identified with spastic musculatures of the right lower lumbar region (Tr. at 562-573).

On February 5, 2007, plaintiff was seen again at the Mt. Grove Clinic by his therapist, Jan Johnson, for an individual

psychotherapy session to treat his major depression (Tr. at 538). His depression was rated as a 2 out of 10 and his anxiety was a 0.  He reported no pain.  He was assessed a GAF score between 54-57.

On April 2, 2007, plaintiff saw his therapist, Jan Johnson, regarding his depressed mood. (Tr. at 537). He reported no pain and was assessed a GAF of 54-57.  He was told to return in six to eight weeks.

An MRI of plaintiff's lumbar spine on April 5, 2007, showed relatively mild scoliosis in the lumbar spine that did not appear as severe from one year earlier (Tr. at 511-512). The MRI additionally showed mild degenerative disk disease with spurring at every level from T12 down to L5 and with more significant degenerative disk disease at L5-S1 (Tr. at 511-512).

On April 17, 2007, plaintiff was evaluated by Dr. Ann Busha with the St. John's Clinic. (Tr. at 521-522).  He reported that he was on Celexa for depression and that he "does well on this." His lung fields were clear to auscultation and his respirations were non-labored.  Plaintiff was assessed with lumbar degenerative disc disease for which Dr. Busha refilled his prescription for Norco (Tr. at 522).  She told him to follow up with a neurosurgeon in Springfield.  Plaintiff was told to continue his Lipitor for high cholesterol, continue Norvasc for

his hypertension which was "well controlled" and continue his current medications for allergic rhinitis.

On April 20, 2007, plaintiff was seen for a one-year follow up by Dr. Ceola regarding his ongoing problems with scoliosis (Tr. at 509). Plaintiff reported that his symptoms were "gradually declining."  Plaintiff reported that pain killers gave him moderate relief from pain, he needed some help with his personal care, pain prevented him from lifting heavy weights but he could manage light to medium weights if they were conveniently positioned, he could only walk if he used a cane or crutches, pain prevented him from sitting for more than an hour or from standing more than a half hour, and that he can travel for more than two hours although it causes "bad pain."  He was diagnosed with "ongoing problems" and told to return in a year.

On July 2, 2007, plaintiff saw Ms. Johnson for individual psychotherapy (Tr. at 536).  Plaintiff rated his depression and anxiety as a 1 out of 10.  He reported no pain.  He was assessed a GAF score of 54-57.

On September 10, 2007, plaintiff saw Ms. Johnson who assisted him with attempting to increase his socialization and to alleviate his depressed mood (Tr. at 535).  Plaintiff said he was thinking about enrolling in an on-line college.  His depression was rated as a 3 and his anxiety as a 2.  His GAF score was 61-

63.[12]  He reported no pain.  He was told to return in 11 to 12
weeks.

On September 18, 2007, plaintiff was seen by Dr. Busha for a
follow up (Tr. at 519-520).  He complained of joint pain in his
hands and finger stiffness.  He had no numbness or tingling in
his hands.  He said his back pain was improved:  "using machine
at gym - doing forward sit ups."  Plaintiff reported shortness of
breath and joint/muscle pain.  On exam his lung fields were clear
to auscultation.  His hands were normal.  He was assessed with
joint pain, for which the doctor was going to order blood work to
rule out inflammatory arthritis, and chronic back pain for which
plaintiff was instructed to continue Norco as needed for pain.
(Tr. at 520).

On October 4, 2007, plaintiff was seen by Dr. Busha
regarding plaintiff's reported pain in his joints along with
reoccurring hand stiffness in the morning (Tr. at 515-516).
Plaintiff was "still keyboarding okay".  Plaintiff's recent blood
work was negative for rheumatoid arthritis.  He was assessed with
osteoarthritis.  The doctor discussed treatment options including
glucosamine (an over-the-counter dietary supplement), non-

_____

[12]A global assessment of functioning of 61 to 70 means some
mild symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships.

steroidal anti-inflammatories, and Tylenol. He was cautioned against using both Tylenol and Norco at the same time.

In 2008, plaintiff continued to be seen by his chiropractor, Dr. St. John, on a monthly basis for chiropractic treatments (Tr. at 552-561). Plaintiff reported continued severe pain in both sides of his lower back, middle back, upper back and neck along with moderate pain in his right shoulder. Dr. St. John noted plaintiff's right leg was one inch shorter than his left leg that indicated functional pelvic deficiency and postural compromise. Dr. St. John further concluded joint dysfunction was evident with myospasm and pain to palpation of the right upper thoracic spine that radiated to the middle thoracic region on both sides with accompanying spastic deep paraspinal musculatures located at the right pelvic region (Tr. at 552-561).

On January 28, 2008, plaintiff saw Ms. Johnson for individual psychotherapy (Tr. at 534). Plaintiff had been participating in vocational rehabilitation. His GAF was 61-63. He reported no pain. He was told to return in four to five months.

On February 19, 2008, plaintiff had a follow up with Dr. Busha (Tr. at 526). Dr. Busha noted that plaintiff's cholesterol was well-controlled, that his depression was stable, and that he should continue taking the same medications for those conditions.

Plaintiff was assessed with thoracic scoliosis and was told to continue taking Lortab as needed for pain.

On April 10, 2008, a spine survey showed a 33 degree curvature of the mid and lower dorsal spine with convexity towards the right and a 22 millimeter pelvic tilt with left iliac crest higher than the right. (Tr. at 529-530).

On May 12, 2008, plaintiff was seen by Ms. Johnson in a therapy session for treatment for his major depression and was given a GAF score 64-67 (Tr. at 533). He described his depression and anxiety as a 2 out of 10. He reported no pain. "Focal issue for today's session was his continued job search." He was told to return in four to five months.

On January 5, 2009, plaintiff reported to his chiropractor, Dr. St. John, that his pain was gradually worsening and prevented him from sitting for more than one hour or standing for more than ten minutes and that he needed a cane to walk (Tr. at 550-551). He reported that he was "able to engage in most, but not all of my usual recreational activities because of pain in my neck."

On January 6, 2009, Dr. St. John completed a Medical Source Statement Physical determining that plaintiff was able to lift and/or carry five pounds frequently and occasionally; stand and/or walk continuously for 15 minutes and for less than one hour during an eight-hour workday; sit for 30 minutes

continuously and for less than one hour during an eight-hour workday with limited pushing and/or pulling; should never climb, balance, stoop, kneel, crouch or crawl; and could occasionally reach and handle (Tr. at 541-542).

## C. *SUMMARY OF TESTIMONY*

During the February 18, 2009, hearing, plaintiff testified; and Jeanine Metildi, a vocational expert, testified at the request of the ALJ.

## 1. **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 47 years of age and is currently 48 (Tr. at 5). Plaintiff was 5'6" tall and weighed approximately 225 pounds (Tr. at 7). Plaintiff was divorced, without children, and living with his parents (Tr. at 7). He has a high school education and two years of college with a diploma in data processing (Tr. at 7).

Plaintiff has a valid driver's license, but tries not to drive for any more than an hour (Tr. at 8).

Plaintiff last worked in 2006 as a salesman, but that job lasted only a week (Tr. at 8). When asked why he only worked a week, plaintiff said, "Not a lot of talent as a salesman. I only had one sale the time I was there, and they wanted more than that. I was fired, or let go." (Tr. at 9). Before that he worked as a night watchman in 2001 (Tr. at 8). At that job, he

supervised about six people (Tr. at 10). Plaintiff left that job because he moved (Tr. at 10). Plaintiff expected to get a job at a prison; but while it was being built, his right hip "went" (Tr. at 10-11).

Plaintiff is unable to work mainly because of an inability to concentrate due to pain (Tr. at 11). Plaintiff is able to bathe and dress himself, he can prepare simple meals such as sandwiches or microwave meals, he is able to clean up after himself, he does dishes with a dishwasher, he does his own laundry, and he goes shopping occasionally for small items (Tr. at 11-12). Plaintiff uses the electric carts when he goes to the store (Tr. at 12). His right hip is "agonizing" (Tr. at 12). His doctor prescribed a cane in 2002 (Tr. at 12). He uses the cane all the time (Tr. at 13).

Plaintiff has spinal scoliosis and degenerative disease in his hip (Tr. at 13). He has trouble lifting, walking, sitting for long periods, being upright (Tr. at 13). Plaintiff estimated he could sit for about 15 minutes comfortably (Tr. at 14). He can stand with his cane for five to seven minutes (Tr. at 14-15). He lies down five or six times a day for anywhere from five minutes to an hour (Tr. at 14). Plaintiff has trouble with sudden movements and stooping (Tr. at 14). He cannot twist (Tr. at 15). He can bend over to tie his shoe or pick something up

off the floor if he does it slowly (Tr. at 15).  He can lift some
weight on his left side but rarely lifts on the right (Tr. at
14).  Plaintiff goes to a hospital gym to lift weights (Tr. at
14).

Plaintiff's right leg is shorter than the other and he has a
built-up shoe on the right (Tr. at 15).  Sudden movements
aggravate plaintiff's neck pain (Tr. at 15-16).  Plaintiff has
trouble with his joints when it is humid (Tr. at 16).  He sees a
chiropractor once a month and that helps (Tr. at 16).  He has
been seeing the chiropractor since about 1972 (Tr. at 16).

Plaintiff participates in counseling because of depression
(Tr. at 16).  He had been in counseling for about three years
(Tr. at 16).  Plaintiff has difficulty concentrating because of
his depression (Tr. at 17).  Plaintiff has a "bad day" due to
depression and pain anywhere from once a week to once a month
(Tr. at 17).  When asked what things he has problems con-
centrating on, plaintiff responded, "Pretty much anything,
really.  I don't have a lot I have to concentrate on." (Tr. at
17).

Plaintiff participates in some church activities (Tr. at
17).  He goes to church about once a month (Tr. at 18).  When
asked what kind of church activities he does, plaintiff said,
"Basically I just show up.  I, I do a lot more at night, about

once a month at the moment, just the kind of weather we've been having that, that sort of thing, I've had some increase in pain and, and mostly just show up for services about once a month." (Tr. at 18).

Plaintiff wears a back brace when he is going to be traveling in the car for an hour or more (Tr. at 19). Sometimes he wears it to the hospital gym (Tr. at 19). When plaintiff wears the brace, it keeps him upright so his other movements are limited (Tr. at 19).

## 2. **Vocational expert testimony.**

Vocational expert Jeanine Metildi testified at the request of the Administrative Law Judge.

The first hypothetical involved a person able to lift and carry ten pounds occasionally and less than ten pounds frequently; stand and walk at least two hours per day but would need a cane for extended ambulation; sit for six hours but must be free to alternate and periodically change positions; could occasionally balance, stoop, kneel, crouch, and climb stairs; could never climb ladders, ropes, or scaffolds or crawl; must avoid concentrated exposure to extreme cold, vibrations, hazardous machinery and unprotected heights; and could only experience occasional changes in work settings (Tr. at 22). The vocational expert testified that such a person could not perform

plaintiff's past relevant work but could be an assembler, D.O.T. 734.687-018, with 11,000 jobs nationally and 700 in Missouri; a table worker, D.O.T. 739.687-182, with 42,000 jobs nationally and 300 in Missouri, or a film touch-up inspector, D.O.T. 726.684-050, with 53,000 jobs nationally and 1,000 in Missouri (Tr. at 22-23).

The second hypothetical was the same as the first but the person would be limited to only occasional bilateral reaching and handling (Tr. at 23). The vocational expert testified that such a person could not perform substantial gainful activity (Tr. at 23).

The third hypothetical involved a person limited to lifting five pounds, standing or walking for 15 minutes at a time and for one hour total per day, and sitting for 30 minutes continuously and for less than one hour per day (Tr. at 24). The vocational expert testified that such a person could not work (Tr. at 24).

The vocational expert testified that using a cane would not interfere with performing a sedentary job (Tr. at 24). There is no standing involved in the assembler position (Tr. at 24). Generally the duties involve visual inspection (Tr. at 24).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Jeffrey Hatfield entered his opinion on March 18, 2009. The ALJ found that plaintiff's last

insured date was December 31, 2006 (Tr. at 38).

Step one.  Plaintiff has not performed substantial gainful activity since his alleged onset date (Tr. at 40).

Step two.  The ALJ found that plaintiff has the following severe impairments:  scoliosis, degenerative disc disease of the lumbosacral spine, and respiratory disorder (Tr. at 43).  He found that plaintiff's mental impairment is not severe (Tr. at 42).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 40).

Step four.  The ALJ found that plaintiff can occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; stand and walk for two hours; sit for six hours; must be able to change positions every 30 minutes; may not climb ladders or ropes or crawl; may occasionally climb ramps and stairs, balance, stoop, kneel, or crouch; must avoid cold environments, vibrating equipment, unprotected heights, and dangerous moving machinery (Tr. at 41).  Because plaintiff has mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, and persistence or pace, he must perform low stress work with occasional changes in the work setting (Tr. at 42).

With this residual functional capacity, plaintiff cannot return to his past relevant work as a security guard (Tr. at 42).

Step five.  Plaintiff is capable of performing the jobs of assembler (with 700 jobs locally and 11,000 nationally), visual inspector (with 300 jobs locally and 42,000 jobs nationally), and film touch-up (with 1,000 jobs locally and 53,000 jobs nationally) (Tr. at 43).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient

reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record
as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence. Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ. In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.
1984). Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the Polaski opinion, and additionally
states that the following factors should be considered:
Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve
pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a

board).

The specific reasons listed by the ALJ for discrediting

plaintiff's subjective complaints of disability are as follows:

> I cannot give weight to the claimant's pain allegations
> because it is not consistent with the objective findings or
> the record as a whole. There is very little evidence of
> treatment and when treated he received mostly conservative
> treatment. Although surgical intervention was considered,
> it has not been done as yet.
>
> The claimant is not currently participating in physical
> therapy and he does not use a TENS unit. However, he has
> been fitted with an orthotic thoracolumbar brace which
> helped his condition. Also, he has the use of a cane for
> ambulation.
>
> Consequently, his subjective complaints are not sufficiently
> credible to require me to accept his testimony of excess
> pain and limitations. Therefore, I rely upon the more
> credible evidence which shows an ability to do sedentary
> exertion.
>
> * * * * *
>
> I also cannot rely on the claimant's testimony as
> establishing greater limitations than those set forth above
> because his statements are not entirely credible. The
> record shows that his condition is stable. The claimant's
> daily activities are also inconsistent with his allegations.
> He does not appear to be too motivated to work. On his
> Function Report, he reported that he lived in a house with
> his family, he goes to the gym 2-3 times a week, goes to the
> library and browse[s] the internet, watched television,
> enjoyed reading, prepared meals, drove his car, shopped and
> attended church services. I find that the claimant's
> inconsistencies negatively impact his credibility and do not
> permit reliance on his statements.

(Tr. at 41-42).

## 1. PRIOR WORK RECORD

Plaintiff has earned a total of $80,240.13 during his entire lifetime -- from 1983 through 2006 when he alleged he became disabled.  Plaintiff previously alleged he became disabled in 2001 -- even considering plaintiff's work record from 1983 through 2001, his lifetime earnings average out to only $4,223 per year.  Plaintiff earned a total of $1,215.18 over a five-year period from 1988 through 1992.  Plaintiff worked as a salesman in 2006 and left that job because he did not have "a lot of talent" as a salesman -- not because of his impairments.  Plaintiff's earnings record, as pointed out by the ALJ, indicates that he has never been very motivated to work.

## 2. DAILY ACTIVITIES

Plaintiff goes to a gym two to three times per week, he performs physical therapy exercises at home, he bicycles and uses weights three times a week, he uses a computer, can prepare simple meals, can clean up after himself, do dishes, do his own laundry, and shop.  In April 2007, plaintiff told Dr. Ceola he could lift light to medium weights if they were conveniently positioned.  In September 2007 -- more than a year after his alleged onset date -- plaintiff reported using machines at the gym and doing forward sit ups.  The following month he reported keyboarding with no difficulty.

In August 2006, plaintiff reported he had no difficulties with activities of daily living. He reported that he does not go out socially because he cannot afford to, but that he enjoyed computer game making and hoped to participate in any type of computer training he could get. He reported in September 2006 that he had not found any "work-at-home things that aren't scams." In May 2008, plaintiff reported that he was continuing his job search. In January 2009, plaintiff said he was able to engage in most, but not all, of his usual recreational activities.

### 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

On March 8, 2005, plaintiff reported to Dr. Ceola that his pain was doing "quite a bit better."

Although a doctor recommended plaintiff try a back brace in September 2005, he did not get fit for the brace until April 2006, indicating that his symptoms were not as bad as he alleges. An MRI of his spine on April 5, 2007, showed "relatively mild" scoliosis less severe from a year earlier and "mild" degenerative disc disease. Later that month, plaintiff told Dr. Ceola that his symptoms were "gradually declining." On September 18, 2007, plaintiff said his back pain was improved.

The records indicate that plaintiff reported "no pain" on February 5, 2007; April 2, 2007; July 2, 2007; September 10, 2007; January 28, 2008; and May 12, 2008.

**4.  *PRECIPITATING AND AGGRAVATING FACTORS***

The record does not contain many references to precipitating or aggravating factors.  In 2003 plaintiff said he experienced pain if he sat too long, without defining "too long."  In 2004 he said he experienced pain if he lay in one position for too long (obviously lying in one position is unrelated to working).

**5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

In April 2007, plaintiff reported that his pain killers gave him moderate relief from pain.  Plaintiff reported that epidural steroid injections improved his symptoms.  Plaintiff also admitted he received relief from chiropractic treatments, physical therapy, and exercise.

**6.  *FUNCTIONAL RESTRICTIONS***

None of plaintiff's treating physicians ever restricted him from any particular activity.

**B.  *CREDIBILITY CONCLUSION***

The record establishes that plaintiff's treatment was conservative, his medications and treatment worked well to control his symptoms, his daily activities remained unchanged for the most part, and that he has had a lifelong lack of motivation

to work.  The record supports the ALJ's decision to discredit
plaintiff's subjective complaints of disabling symptoms.

## VII. *OSTEOARTHRITIS AND DEPRESSION*

Plaintiff argues that the ALJ erred in finding that his
osteoarthritis and depression were not severe impairments.
Plaintiff suggests that his ability to reach and handle bi-
laterally should have been limited to "occasionally" due to
"reoccurring hand stiffness from the osteoarthritis" and that he
has difficulty concentrating because of depression.

A severe impairment is an impairment or combination of
impairments which significantly limits a claimant's physical or
mental ability to perform basic work activities without regard to
age, education, or work experience.  20 C.F.R. §§ 404.1520(c),
404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-
severe impairment.

> (a)  Non-severe impairment(s).  An impairment or
> combination of impairments is not severe if it does not
> significantly limit your physical or mental ability to do
> basic work activities.

> (b)  Basic work activities. When we talk about basic
> work activities, we mean the abilities and aptitudes
> necessary to do most jobs.  Examples of these include--

> > (1)  Physical functions such as walking, standing,
> > sitting, lifting, pushing, pulling, reaching, carrying,
> > or handling;

> > (2)  Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by osteoarthritis in his hands or depression.  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard".  <u>Kirby v. Astrue</u>, 500 F.3d 705, 708 (8th Cir. 2007) (citing <u>Hudson v. Bowen</u>, 870 F.2d 1392, 1395 (8th Cir. 1989)) (citation omitted).  Further, the ALJ is required to consider all impairments, severe and non-severe, in combination in determining a claimant's residual functional capacity.  20 C.F.R. §§ 404.1523 and 416.923.

<u>Osteoarthritis in his hands</u>.  The evidence supports the ALJ's finding that plaintiff's hand impairment was not severe.  Plaintiff complained of hand pain in September 2007 but denied any numbness or tingling.  On April 11, 2006, plaintiff had "good hand strength."  On September 18, 2007, he complained of hand pain, but on exam his hands were normal.  On October 4, 2007, he complained of hand stiffness, but his doctor noted that he was "still keyboarding okay."

Plaintiff exhibited normal hand strength, his doctor observed no abnormalities in his hands, and laboratory tests were negative for inflammatory arthritis. Plaintiff was told to take non-steroidal anti-inflammatories, and never anything stronger for hand pain. After he was given this recommendation, plaintiff did not seek any further medical treatment for hand pain.

In addition, plaintiff continued to use his hands without difficulty as he retained the ability to use a keyboard on a computer while creating computer video games. He exhibited no problems using his hands or writing. His medical records fail to demonstrate that his alleged hand pain caused any work-related limitations.

Depression. Likewise, the evidence supports the ALJ's finding that plaintiff's mental impairment was not severe.

In a "Written Questions to Claimant" dated January 2, 2009, plaintiff wrote that his depression was "not extreme" (emphasis in the original). When asked how his mental condition limits his ability to work, plaintiff left that blank. He also left blank the sections that asked how his mental condition limits his ability to interact with supervisors and co-workers; understand, remember, and carry out technical or complex job instructions; understand, remember, and carry out simple one- or two-step job instructions; deal with the public; and maintain concentration

and attention for at least two-hour increments.

In January 2003 plaintiff was asked whether in the past year he had felt sad, blue, or depressed for two weeks or more, and he answered, "no." He was asked if he had felt depressed or sad much of the time in the past year, and he answered, "no." On August 1, 2006 -- the day before his alleged onset date -- plaintiff reported no difficulties with activities of daily living. When asked about his social life, he said, "I don't go out socially, you need an income for that." He reported that he enjoyed "computer game making." Plaintiff said his future educational goals included "any type of computer training that he can get." Plaintiff said that for the past two months he had been having difficulty concentrating, remembering, making decisions. Apparently based on that allegation, plaintiff was diagnosed with major depressive disorder, recurrent, moderate.

On February 5, 2007, plaintiff's depression was rated as a 2 out of 10 and his anxiety was a 0. On April 17, 2007, plaintiff reported that he was on Celexa for depression and that he "does well on this." On July 2, 2007, plaintiff rated his depression and anxiety as a 1 out of 10. On September 10, 2007, his depression was rated as a 3 and his anxiety as a 2. His psychotherapist stated plaintiff did not need to return for another 11 to 12 weeks indicating plaintiff's mental symptoms

were not as bad as he currently alleges. On February 19, 2008, plaintiff's depression was listed as stable. On May 12, 2008, plaintiff described his depression and anxiety as a 2 out of 10. The focus of his therapy that day was his continued job search. Plaintiff was told to return in four to five months, again supporting a finding that his mental impairment was not severe.

There simply is no credible evidence that plaintiff suffered from problems concentrating because of a mental impairment.

Based on the above I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's alleged hand impairment and mental impairment were not severe.

## VIII. IGNORING MEDICAL RECORDS WHEN FORMULATING RFC

Plaintiff next argues that the ALJ erred in ignoring three years' worth of medical records and the opinion of plaintiff's chiropractor in assessing plaintiff's residual functional capacity. The ALJ's failure to rely on the opinion of plaintiff's chiropractor is discussed more fully in the next section. Suffice it to say here that the ALJ properly excluded the opinion of Dr. St. John when assessing plaintiff's residual functional capacity.

Plaintiff argues that the ALJ ignored medical records from May 2006 through February 2009:

> Here, the ALJ provided a partial review of the medical
> evidence showing the type of medical treatment Scheets

42

received. (Tr. at 41-42). The ALJ failed to address every medical opinion in the record as required by SSR 96-8p and SSR 96-5p. The ALJ's review of the medical evidence stopped in May 2006 when he noted Scheets was fitted for an orthotic thoracolumbar brace. (Tr. at 41). Scheets continued to receive medical treatment after May 2006 and up to the day of his hearing in February 2009.

Plaintiff's last insured date was December 31, 2006. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." Strong v. Soc. Sec. Admin., 88 Fed. Appx. 841, 846 (6th Cir. 2004). Medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured. See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (medical evidence after date last insured was only minimally probative of claimant's condition before date last insured, so did not affect disability determination); see also Begley v. Matthews, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time."); Tecza v. Astrue, 2009 WL 1651536 (W.D. Pa., June 10, 2009). Evidence which is dated after a claimant's last insured date, to the extent that it relates back, is relevant only if it is reflective of a claimant's limitations prior to the date last insured, rather than merely

his impairments or condition prior to this date. See 20 C.F.R. §
416.945(a)(1) ("Your impairment(s), and any related symptoms,
such as pain, may cause physical and mental limitations that
affect what you can do in a work setting. Your residual
functional capacity is the most you can still do despite your
limitations."); see also Higgs, 880 F.2d at 863 ("The mere
diagnosis . . . , of course, says nothing about the severity of
the condition.").

Plaintiff did not see a doctor between August 2006 and April
2007. He did not see another doctor again until September 2007
when his chief complaint was hand pain and he was told to take a
non-steroidal anti-inflammatory. Plaintiff waited another five
months before seeking medical treatment again. Even plaintiff's
counseling sessions occurred months apart at the recommendation
of plaintiff's counselor. Plaintiff was fitted with a back brace
in April 2006 and was told to consider surgery if the brace did
not help. Plaintiff never underwent surgery, suggesting that his
back brace was successful in managing his symptoms.

An administrative law judge must determine a claimant's
residual functional capacity based on all of the relevant
evidence, including medical records, observations of treating
physicians and others, and an individual's own description of his
limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000).  In determining plaintiff's RFC, the ALJ discussed the
record as a whole and supported his findings with a narrative
discussion.  The ALJ's RFC assessment properly took into account
only plaintiff's credible limitations.  <u>Tindell v Barnhart</u>, 444
F.3d 1002, 1007 (8th Cir. 2006).  I find that the substantial
evidence in the record as a whole supports the ALJ's RFC
assessment.

### IX.  *PLAINTIFF'S CHIROPRACTOR*

Plaintiff argues that the ALJ erred in discrediting the
opinion of plaintiff's chiropractor because he was not an
"acceptable medical source."  On January 6, 2009, Dr. St. John
completed a Medical Source Statement Physical determining that
plaintiff was able to lift and/or carry five pounds frequently
and occasionally; stand and/or walk continuously for 15 minutes
and for less than one hour during an eight-hour workday; sit for
30 minutes continuously and for less than one hour during an
eight-hour workday with limited pushing and/or pulling; should
never climb, balance, stoop, kneel, crouch or crawl; and could
occasionally reach and handle.

On August 9, 2006, the Social Security Administration issued
Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9,
2006).  The ruling clarified how it considers opinions from
sources who are not what the agency terms "acceptable medical

sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1. Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2. Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3. Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20

C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. quoting SSR 06-3p.

The ALJ had this to say about the opinion of Dr. St. John, plaintiff's chiropractor:

> Gerald St. John, chiropractor, completed a Medical Source Statement - Physical on January  6, 2009, finding the claimant totally disabled.
>
> As stated above, the claimant has a long history of back pain since about 10 years old, which progressively worsened over the years radiating to the right leg.  He has a known dextrorotary scoliosios [sic] of about 30 degrees in an April 2006 study, which improved from the study of November 2004. It is noted, however, that his condition improved with therapy and steroid injections.  He also had a shortened right left [sic] leg and uses a lift and the use of a cane for walking.  He was considered a surgical candidate at one time on an [sic] subsequent visits [sic].  He complained of ongoing low back pain and was fitted for a [sic] orthotic thoracolumbar brace in May 2006.
>
> I give weight therefore, to the conclusions of the medical consultants (DDS) because their conclusions are consistent with the objective findings and the evidence of record. . . .

> I give no weight to the most generous assessment of Dr. St.
> John because he is a chiropractor and not an acceptable
> medical source.  I find his assessment extreme and not
> supported by the objective findings.

(Tr. at 41).

The opinion of Dr. St. John at issue here is a medical opinion which, according to the regulations, a chiropractor cannot give.  Further, the ALJ explicitly found that Dr. St. John's "most generous opinion" was not supported by the objective findings.

Dr. St. John found that plaintiff could stand, walk, and sit for a total of less than two hours per workday.  That leaves nothing but lying down or reclining for the majority of each day. There is not one mention in any of the medical records or testimony that plaintiff ever needs to recline.  Although plaintiff testified that he needs to lie down five or six times a day, he never reported this to any doctor, nurse, therapist, or to Dr. St. John.  In fact, plaintiff at one time reported that lying for too long caused him pain.  Dr. St. John never recommended that plaintiff lie down or recline during the day.

Lending even more absurdity to Dr. St. John's opinion is his answer to the following question:  "If patient suffers pain, is there a need to lie down or recline to alleviate symptoms during an 8 hour work day?"  He checked, "Unknown."  Clearly Dr. St. John did not believe that plaintiff could only sit, stand, and

walk for less than two hours total per day -- even the most basic logic would lead such a person to conclude that the patient MUST have a need to lie down or recline during almost his entire day.

As a treating chiropractor, Dr. St. John could have provided information based on his special knowledge of plaintiff and could have provided insight into the severity of plaintiff's impairments and how they affect plaintiff's ability to function. Instead, Dr. St. John merely checked the most restrictive limitations on every category of the form making it essentially useless. The ALJ properly gave no weight to this opinion.

## X. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 14, 2011